**Gerald CLARK et al.,
Plaintiffs-Appellants,**

v.

**LOMAS & NETTLETON FINANCIAL CORPORATION et al.,
Defendants-Appellees.**

**No. 78–2973.**

United States Court of Appeals,
Fifth Circuit.

Aug. 28, 1980.

Jay S. Fichtner, Douglas E. Yeager, Dallas, Tex., David Berger, Philadelphia, Pa., for plaintiffs-appellants.

Locke, Purnell, Boren, Laney & Neely, Stanley E. Neely, Stephen Philbin, Dallas, Tex., Beale Dean, Brown, Herman, Scott, Dean & Miles, Fort Worth, Tex., for Lomas & Nettleton Financial Corp., The Lomas & Nettleton Co., Lomas & Nettleton West, Inc., Jess T. Hay, Albert Rohnstedt, Dewitt T. Ray, John Sexton & James B. Gardner.

Saner, Jack, Sallinger & Nichols, Tim Kirk, Dallas, Tex., for NCS Computing Corp., now known as Booth, Inc.

Rain, Harrell, Emery & Doke, Stan McMurry, Dallas, Tex., for Guy W. Rucker, Martin T. Whitmer & Jack J. Booth.

Geary, Stahl, Koons, Rohde & Spencer, Joseph W. Geary, Gerald P. Urbach, Dallas, Tex., for Ernst & Ernst.

Jackson, Walker, Winstead, Cantwell & Miller, John Lancaster, III, Dallas, Tex., for Richard Rogers & Dan Busbee.

Before SIMPSON, HILL and HATCHETT, Circuit Judges.

JAMES C. HILL, Circuit Judge:

NCS Computer Corp. [NCS], a Texas corporation, was formed in 1968 to develop and market computer software. The following year, Lomas & Nettleton Financial Corp. [LNFC] allegedly acquired "control" of NCS by inducing it to issue shares in consideration of a service contract that, it is alleged, LNFC never intended to perform. Once in "control," LNFC allegedly set about to "dismantle" NCS, installing its own slate of directors who allegedly permitted LNFC to dishonor its contract with NCS while LNFC developed internal data processing capability. By 1972, LNFC apparently was in a position to compete directly with NCS, whose active operations meanwhile had been drastically curtailed. Merger discussions began with Booth, Inc. [Old Booth], a closely held vendor of soft drink dispensers that was interested in NCS's liquid assets. In 1973, Old Booth and

NCS agreed to merge in a stock/stock transaction, NCS surviving. The merger terms provided that LNFC would purchase NCS's computer related assets. The entity that was NCS took on the name Booth, Inc. [Booth], continuing the soft drink dispenser business inherited from Old Booth, and exiting altogether from the data processing field.

Within two months of the NCS-Old Booth merger, several Booth shareholders commenced the instant action. The original complaint, directed solely at pre-merger events, charged LNFC and related persons with various securities frauds, 15 U.S.C.A. §§ 78j, 78n (West 1971); 17 C.F.R. §§ 240.-10b–5, 240.14a–9 (1979), and pendent state law omissions. Appellants sued both individually and derivatively on behalf of Booth. See Fed.R.Civ.P. 23.1. In respect of the derivative claims, although "demand" had not been made on them,[1] Booth's directors evidently were content to allow appellants to proceed. The company, a nominal defendant, answered simply by stating that recovery under the derivative claims should accrue to it. Beyond that, the company apparently took no active part in the early litigation.

Following some eighteen months of discovery, and a second fruitless "demand" on Booth's directors,[2] appellants sought to amend their complaint so as to attack the NCS-Old Booth merger, and specifically the sale of NCS's computer related assets to LNFC. The merger, appellants charged, resulted from proxy misstatements allegedly made by LNFC's "captive" NCS managers, and by which LNFC allegedly was enabled to obtain NCS's computer related assets at distress prices. To these new claims, all derivative in nature, Booth again answered neutrally that recovery thereunder should accrue to it. Actual pursuit continued as before through appellants' sole efforts, neither assisted nor opposed by Booth.

In 1976, appellants again sought to amend their complaint, this time to join certain Old Booth officials—one of whom became and remains Booth's president and largest shareholder—as aiders and abettors of LNFC. Then, three years into the litigation, appellants met their first resistance from Booth. In contrast with its response to appellants' second complaint, Booth now prayed that the district court deny leave to amend. Some months later, after amendment was permitted, Booth joined with the newly named individuals in moving to dismiss the counts against them. This motion also was denied. Appellants meanwhile continued to prepare for trial in January, 1978.

One week before trial was to begin, Booth once more entered the fray, this time to terminate all of the derivative claims by settling them. Without the presence or knowledge of appellants, Booth representatives met with the various defendants and reached an overall compromise within three days. In substance, the compromise provided that LNFC would tender to Booth all of its shares in that company; that LNFC would pay Booth $415,000 cash; and that various former NCS officials would waive indemnification claims against Booth. Booth's directors ratified the compromise, and over appellants' vigorous objections the district court "tentatively" approved it pending an evidentiary hearing on fairness and adequacy. As required by Rule 23.1, Booth shareholders were notified of the proposed settlement. None (other than plaintiffs) objected. The evidentiary hearing occurred, at which the parties argued principally over the value of appellants' chances of success on the merits and the disinterest of Booth's directors. "[A]fter a thorough review of the entire record," the district court determined both that the board was disinterested and that "the set-

---

1. Appellants' original complaint alleged that demand had been made on the NCS board prior to the NCS-Old Booth merger, which demand allegedly had been refused.

2. There apparently exists a dispute over the sufficiency of appellants' second "demand" on Booth's directors. The district court expressly reserved judgment on the question, which in any event does not bear on our decision.

tlement amount and the terms are adequate, fair and reasonable." *Clark v. Lomas & Nettleton Finance Corp.*, 79 F.R.D. 641, 652 (N.D.Tex.1978). This appeal followed.

■ As the district court apparently recognized, the threshold question is whether Booth's directors possessed authority, vel non, to determine that the corporation should compromise appellants' derivative claims. At first blush, it would seem anomalous that corporate directors could tardily and peremptorily intervene to extinguish shareholder derivative actions, over the plaintiffs' heads and despite their objections. But while the propriety of such intervention may be questioned, the power can not be. Appellants' action is "derivative" because the rights asserted belong not to them but to Booth, Inc. Corporate litigation policy—whether to enforce corporate rights of action—plainly constitutes part of the "business and affairs," Tex.Bus.Corp. Code § 2.31 (Vernon 1980), that corporate directors primarily manage. *See Square 67 Development Corp. v. Red Oak State Bank*, 559 S.W.2d 136, 138 (Tex.Civ.App.1977).[3] On this premise, which is neither extraordinary nor novel, courts have repeatedly held that corporate directors are empowered to abort putative shareholder derivative suits, when it is their business judgment that the cause ought not be enforced. *See, e. g., United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263–64, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917) (Brandeis, J.); *Lewis v. Anderson*, 615 F.2d 778, 781–82 (9th Cir. 1979); *Abbey v. Control Data Corp.*, 603 F.2d 724, 729–30 (8th Cir. 1979), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980); *Cramer v. General Telephone & Electronics Corp.*, 582 F.2d 259, 273–78 (3d Cir. 1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90

(1979); *Auerbach v. Bennett*, 47 N.Y.2d 619, 631, 393 N.E.2d 994, 1000, 419 N.Y.S.2d 920, 927 (1979); *Zauber v. Murray Savings Association*, 591 S.W.2d 932, 936 (Tex.Civ.App. 1979). Correlatively, corporate directors possess inherent authority to compromise such suits. *See Saylor v. Lindsley*, 456 F.2d 896, 899–900 (2d Cir. 1972) (Friendly, J.); *Denicke v. Anglo California National Bank*, 141 F.2d 285, 288 (9th Cir.), *cert. denied*, 323 U.S. 739, 65 S.Ct. 44, 89 L.Ed. 592 (1944).

As with other management functions, however, the power to control corporate litigation presupposes that the directors have no interest in its exercise. *See Galef v. Alexander*, 615 F.2d 51, 58–61 (2d Cir. 1980); *Maldonado v. Flynn*, 413 A.2d 1251, 1263 (Del.Ch.1980). *See generally* Note, *The Business Judgment Rule in Derivative Suits Against Directors*, 65 Cornell L.Rev. 600 (1980). We must further inquire, therefore, whether in negotiating the compromise Booth's directors stood "in a dual relation [that] prevent[ed] an unprejudiced exercise of judgment." *United Copper Securities*, 244 U.S. at 264, 37 S.Ct. at 510, quoted in *Galef*, 615 F.2d at 60. *See, e. g., Ash v. International Business Machines, Inc.*, 353 F.2d 491, 493 (3d Cir. 1965), *cert. denied*, 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966); *Swanson v. Traer*, 249 F.2d 854, 858–59 (7th Cir. 1957). In this connection, appellants point out that co-defendant Jack Booth—one of the Old Booth officials joined in 1976—is president, a director and the largest Booth shareholder. Mr. Booth and LNFC together own a majority of Booth's outstanding shares. Booth's charter forbids cumulative voting, and it is undisputed that each and every director who ratified the compromise was elected by Jack Booth's and LNFC's combined vote.[4] A majority of those directors,

---

**3.** Although plaintiffs assert federal claims, this and similar matters of internal corporate power are in the first instance controlled by state law. *See Burks v. Lasker*, 441 U.S. 471, 477–80, 99 S.Ct. 1831, 1836–1838, 60 L.Ed.2d 404 (1979). Booth is a Texas corporation, and in the absence of any contrary suggestion by either party we shall assume that Texas law supplies the pertinent rules of decision. *Cf. Jefferson Pilot*

*Broadcasting Co. v. Hilary & Hogan, Inc.*, 617 F.2d 133, 135 (5th Cir. 1980).

**4.** Booth's April, 1977 proxy statement states as follows:

On March 7, 1977, the only shareholders known to own of record and/or beneficially more than 10% of the outstanding common stock of the Company were Jack J. Booth,

moreover, were insiders. Jack Booth and LNFC wielded power to strip them not only of directorates, but of officer and consultant positions as well. Nor can we ignore the possibility of "structural bias" in this case, *see* Note, *supra*, 65 Cornell L.Rev. at 619–22, suggested by Booth's sudden, hostile reaction to Mr. Booth's joinder.

The district court forthrightly confronted the conflicts question, but in the end did little more than state its conclusion that the new Booth board was disinterested:

> The Board of Directors of Booth, Inc. that approved the settlement of the derivative action was comprised of different individuals than those who occupied those positions at the time of [the acts complained of] . . . . The fact that LNFC and Jack Booth have controlled more than 50% of the stock of Booth, Inc. since May 10, 1973 does not, by itself, establish that the Board of Directors of Booth, Inc. were unable to make an independent judgment about the settlement proposal. Jack Booth was specifically excluded from the Board meeting and did not vote on the settlement proposal. . .

> . . . [T]he majority of the 7 man Board of Directors of Booth, Inc. was disinterested. Jack Booth, the only defendant on the Board, was excluded from the Board meeting by Booth's lawyer.

*Clark v. Lomas & Nettleton Financial Corp.*, 79 F.R.D. 641, 649–50 (N.D.Tex.1978). The preceding discussion simply does not address appellants' main point, which is that Jack Booth's and LNFC's combined shareholdings may have influenced the settlement terms. It is irrelevant that Jack Booth did not vote on the compromise proposal as a director; appellants' objection looks to his status as a shareholder.

■ We are guided by cases excusing the "demand" requirements of Rule 23.1.

*See generally* Note, *Demand and Standing Requirements in Stockholder Derivative Actions*, 44 U.Chi.L.Rev. 168 (1976); Note, *Demand on Directors and Shareholders as a Prerequisite to a Derivative Suit*, 73 Harv. L.Rev. 746 (1960). It is generally held that shareholders may sue derivatively, without first demanding that the directors enforce the corporate cause, when the circumstances would render such demand a futile gesture. *See, e. g., Elfenbein v. Gulf & Western Industries, Inc.*, 590 F.2d 445, 450 (2d Cir. 1978) (per curiam); *In re Kauffman Mutual Fund Actions*, 479 F.2d 257, 263 (1st Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973); *Liboff v. Wolfson*, 437 F.2d 121, 122 (5th Cir. 1971) (per curiam). Where as here, the controlling shareholders are named defendants, demand "futility" is presumed:

> The court should not cajole itself into the believing that the members of a Board of Directors elected by the dominant and accused majority stockholder, after accusations of wrongdoing have been made, were selected for membership on the Board to protect the interests of the minority stockholders and to assure a vigorous prosecution of effective litigation against the offending majority.

*Cohen v. Industrial Finance Corp.*, 44 F.Supp. 491, 494 (S.D.N.Y.1942), quoted in *deHaas v. Empire Petroleum Co.*, 286 F.Supp. 809, 814–15 (D.Colo.1968), *modified on other grounds*, 435 F.2d 1223 (10th Cir. 1970). *See Abbe v. Goss*, 411 F.Supp. 923, 924–25 (S.D.N.Y.1975) (demand on directors excused where three defendants owned 44% of the outstanding shares); *In re Penn Central Securities Litigation*, 367 F.Supp. 1158, 1164–65 (E.D.Pa.1973) (demand on directors excused where one defendant owned 80% of outstanding shares). To excuse demand in these cases was effectively to hold that the directors were incompetent to decide that the action should not be brought. Their business judgment became irrelevant to the

---

who owns 1,107,424 shares of record (approximately 45%) and Lomas & Nettleton Financial Corporation, which owned 258,983 shares of record (approximately 11%). The Company has been advised that both Jack J.

Booth and Lomas & Nettleton Financial Corporation intend to vote their shares in favor of the election of the nine directors proposed by management. . . .

plaintiffs' standing, for it never was consulted. We hold, by a parity of reasoning,[5] that Booth's directors were incompetent themselves to compromise all of appellants' derivative claims.[6]

The preceding conclusion compels that we vacate the compromise. The board's conflict of interest could not be cured by judicial approval of the settlement terms. "Fairness," "reasonableness" and "adequacy" in this context connote only that the terms fall within a range of magnitude that the directors, in the exercise of their business judgment, could legitimately accept. This "range of reasonableness," *Lewis v. Newman*, 59 F.R.D. 525, 529 (S.D.N.Y.1973) (Weinfeld, J.) quoting *Newman v. Stein*, 464 F.2d 689 (2d Cir.) (Friendly, J.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972), plainly may encompass terms that, while apparently "fair," may nonetheless have suffered from incestuous negotiation. It is indeed for this very reason that we bifurcate our review of derivative settlements, *see Miller v. Republic National Life Insurance Co.*, 559 F.2d 426, 428–29 (5th Cir. 1977); *Young v. Katz*, 447 F.2d 431, 432–33 (5th Cir. 1971), by focusing on conflicting interests independently of the terms themselves. Our holding pretermits review of whether the terms actually negotiated were "reasonable" in relation to the claims surrendered. That question will arise, if ever, only when this case is settled by parties unbeholden to the alleged wrongdoers.

### VACATED and REMANDED.

**5.** By looking to cases excusing the "demand" requirements of Rule 23.1, we do not mean necessarily to equate the showing of interest that would excuse such "demands" and that necessary to vitiate subsequent director action. The former is more rigorous. *See Galef v. Alexander*, 615 F.2d 51, 59 (2d Cir. 1980); *Heit v. Baird*, 567 F.2d 1157, 1162 n. 6 (1st Cir. 1977). To the extent that cases excuse shareholder "demands" on facts comparable to those at hand, they apply a fortiori to subsequent director action.

**6.** We observe that Mr. Booth is not implicated in all of appellants' charges, and particularly those involving pre-merger events. We need not now decide whether, given the dynamics of

Mr. Booth's and LNFC's respective shareholdings and litigation interests, Booth's directors lawfully could compromise those counts in which Mr. Booth is not named. Nor does this case present any issue respecting whether, under Texas law, a duly constituted executive committee could have achieved what the directors unsuccessfully attempted. *E. g., Lewis v. Anderson*, 615 F.2d 778 (9th Cir. 1979); *Abbey v. Control Data Corp.*, 603 F.2d 724 (8th Cir. 1979), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980); *Rosengarten v. International Tel. & Tel. Corp.*, 466 F.Supp. 817 (S.D.N.Y.1979); *Gall v. Exxon Corp.*, 418 F.Supp. 508 (S.D.N.Y.1976). *See generally* Note, *supra*, 65 Cornell L.Rev. at 608–16.