Thomas M. **GAUBERT**, et al.,
Appellants,

v.

**FEDERAL HOME LOAN BANK BOARD**, et al., Appellees.

No. 88–5077.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 4, 1988.

Decided Dec. 9, 1988.

Abbe David Lowell, with whom Sean Connelly and Elizabeth C. Brooks, Washington, D.C., were on the brief, for appellants.

Kirk K. Van Tine, with whom Perry O. Barber, Jr., Timothy S. Durst, and Jordan Luke, Gen. Counsel, Jack D. Smith, Deputy Gen. Counsel, Dorothy L. Nichols, Senior Associate Gen. Counsel, and Colleen B. Bombardier, Asst. Gen. Counsel, Federal Home Loan Bank Board, Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, and STARR and SENTELLE, Circuit Judges.

Opinion for the court filed by Chief Judge WALD.

WALD, Chief Judge:

Appellant Thomas M. Gaubert brought this derivative action on behalf of Independent American Savings Association ("IASA"), a federally-insured savings and loan association of which he is the majority shareholder, against the Federal Home Loan Bank Board ("FHLBB") and the Federal Savings and Loan Insurance Corporation ("FSLIC"). Gaubert alleges that these federal agencies plundered IASA, and challenges the decision of the FHLBB to appoint the FSLIC as receiver for IASA on May 20, 1987. The district court dismissed Gaubert's complaint on the ground that it failed to aver with sufficient particularity why it would have been futile for Gaubert to demand that IASA's board of directors carry the suit forward before proceeding with it himself in a derivative capacity. *See* Fed.R.Civ.P. 23.1. We find that the district court did not abuse its discretion in dismissing this suit, and we affirm its judgment.

## I. BACKGROUND

In January 1983, Gaubert acquired a controlling interest in a Texas savings and loan that he subsequently renamed Independent American Savings Association. According to Gaubert's Amended Verified Complaint,[1] Appellants' Appendix ("App.") at 26–47, IASA was profitable when he gained control, and it remained profitable through the end of 1984 under his supervision as chairman of the board of directors. Indeed, Gaubert argues that IASA grew steadily under his direction through early 1986.

Gaubert alleges the inception in April 1986 of a far-reaching conspiracy of corporate intrigue and regulatory sabotage. According to his complaint, the Federal Home Loan Bank of Dallas ("FHLB–D") threatened to close IASA unless the Association's board of directors tendered their resignations. When they did so, Gaubert alleges, the FHLB–D replaced them with its own "handpicked" directors, and IASA's financial picture became less rosy: although

conceding that the shareholders approved these directors, Gaubert argues that this board (and officers selected by the FHLB–D) mismanaged and looted IASA, and was responsible for creating reported negative net worth of $440 million at the end of fiscal year 1986. Gaubert also maintains that the FHLB–D sought to induce IASA to acquire another savings and loan, Investex Savings of Tyler, Texas, which was failing and would otherwise have required a $40 to 50 million payout from the FSLIC. Moreover, Gaubert contends that the FHLBB conspired to remove him from the day-to-day operations at IASA at precisely the time that IASA needed him most.

In January 1987, the complaint continues, IASA shareholders met and rejected the slate of directors allegedly backed by the FHLB–D and replaced them with some of IASA's previous directors. These directors convinced the state of Texas to come in as conservator, and the state replaced the board elected by the shareholders with a new and final board. It was upon this final board that Gaubert would have had to make demand, or provide an explanation why he had not done so.

During April and May of 1987, the final board hired consultants to investigate IASA's predicament. According to Gaubert's complaint, at least one of these consultants concluded that the officials installed by the FHLB–D were responsible for IASA's economic problems, but that these problems could be worked out. The complaint further alleges, however, that the FHLBB ultimately persuaded the final board that IASA would never be able to correct its problems, and the final board therefore closed IASA. The FHLBB in turn determined that IASA was insolvent, which allowed it on May 20, 1987, to appoint the FSLIC as receiver pursuant to 12 U.S.C. § 1464(d)(6)(A)(i).

On June 19, 1987, the last day of the 30–day period established by the statute for challenging the appointment of the receiver, *see* 12 U.S.C. § 1464(d)(6)(A), Gau-

---

**1.** Our analysis of Gaubert's complaint under Rule 23.1 is based on the adequacy of the complaint itself. *See* Heit v. Baird, 567 F.2d 1157, 1159 n. 3 (1st Cir.1977).

bert filed this derivative action with the district court for the District of Columbia. The complaint alleges that the federal authorities "placed the institution into receivership for the dual self-serving purpose of covering their conspiracy, and frustrating the shareholders' legitimate claims on behalf of the association and themselves." Amended Verified Complaint ¶ 7 (App. at 28). Gaubert charges that these alleged facts show that the FHLBB and the FSLIC did not have grounds to seek the closing of and receivership of IASA. He argues further that the federal agencies had unclean hands and were estopped from acting to place IASA into receivership. Gaubert also claims that the agencies deprived shareholders and IASA of their fifth amendment due process rights.

Gaubert forthrightly concedes that he did not make a demand on the final board to institute this action on behalf of the association. Rather, he argues that such demand would have been futile under the circumstances and therefore should be excused. The specific allegations lodged against this final board in the complaint are set out below.

8. ... During the entire period from April 1986 until IASA was closed in May 1987, except for a brief period of several days when the board of directors of IASA consisted of independent people duly elected at an annual meeting of the stockholders, *the IASA board was a captive, and served at the sufferance of, government regulators*, either federal or, for the four months prior to the appointment of the receiver, state....

9. ... [*The final board of directors*] *was chosen by and was beholden to the Texas Savings and Loan Commissioner*, the person who ultimately ordered IASA wrongfully to be closed. *This board was also the subject of relentless pressure to close IASA* being exerted by the FHLBB and the [FHLB–D]. Such a board could hardly be expected to agree to challenge an action which it, and the state and federal regulators who controlled it, had collaborated and schemed to take.

10. In addition, *the board of directors* put into IASA by the state regulators *had no financial ties or stake in the association*. After they carried out the FHLB–D's bidding, by closing IASA so that a receivership could be appointed, *they literally dispersed and never met again.... The transient, state-appointed directors were in not position* [*sic*]—because of their having left and because of the lack of time—*to pursue any claims on behalf of IASA*. Indeed, *by the last day of the period established by law for challenging a receivership, the state-selected board had taken no action to do so.*

App. at 28–30 (emphasis added). The italicized portions of these passages reflect the sum total of what Gaubert claims are adequately particularized reasons for not making a demand on the board to legally challenge the appointment of a receiver.

On the basis of these allegations, the district court dismissed the complaint. Reasoning that "[s]uch allegations might survive a motion to dismiss where notice pleading is in order," the court nevertheless concluded that "Rule 23.1 effects a dramatic departure from notice pleading. Plaintiff's statement of ultimate facts does not meet the test of particularity required by that rule." *Gaubert v. Federal Home Loan Bank Board*, Civil Action No. 87–01682, slip op. at 2 (D.D.C. Nov. 23, 1987) [available on WESTLAW, 1987 WL 14783] (citing *In re Kauffman Mutual Fund Actions*, 479 F.2d 257, 263 (1st Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973), which noted that "the stockholder may not plead in general terms, hoping that, by discovery or otherwise, he can later establish a case."). The district court's dismissal was with prejudice. *Gaubert v. General Home Loan Bank Board*, Civil Action No. 87–01682, Order (D.D.C. Feb. 12, 1988) [1988 WL 15189].

## II. ANALYSIS

Rule 23.1 provides in pertinent part that parties bringing derivative actions to enforce a right of a corporation must "allege

with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... or ... [the reasons] for not making the effort." In challenging the district court's dismissal of his complaint, appellant raises several issues with regard to this requirement. First, does federal law or state law define the substantive contours of the demand requirement, and when as a *substantive* matter will demand be excused as futile?[2] Second, are there certain circumstances—such as in the receivership context—where the demand requirement should be held per se inapplicable? And third, if the requirement does apply, what factual allegations are required by the Rule to satisfy the *procedural* requirement of "particularity" in pleading? We will deal with these issues in turn.

## A. *The Substance of the Demand Requirement*

The requirement of the exhaustion of intracorporate remedies as a precondition to the commencement of a shareholder derivative suit originated in the English courts of equity. *See, e.g., Foss v. Harbottle,* 2 Hare 461, 67 Eng.Rep. 189 (V.Ch. 1843). In the United States, the Supreme Court first articulated the "demand requirement" for derivative actions in *Hawes v. Oakland,* 104 U.S. 450, 26 L.Ed. 827 (1882). There the Court required the shareholder-plaintiff to

> show to the satisfaction of the court that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes. He must make an earnest, not a simulated effort, with the managing body of the corporation, to induce remedial action on

their part, and this must be made apparent to the court.... And he must show a case, if this is not done, where it could not be done, or it was not reasonable to require it.

*Id.* at 460–61.[3] The Court soon thereafter implemented its holding in *Hawes* through Equity Rule 94 (1882), and later through Equity Rule 27 (1912). The Federal Rules of Civil Procedure incorporated Equity Rule 27 in Rule 23(b), which in 1966 was substantially restated in current Rule 23.1. *See* Comment, "The Demand and Standing Requirements in Stockholder Derivative Actions," 44 U.Chi.L.Rev. 168, 171 n. 23 (1976). Many jurisdictions have expressly imposed the demand requirements by statute or court rule, but it "usually applies even in the absence of statute or court rule to such effect." H. Henn & J. Alexander, Laws of Corporations § 364 (3d ed. 1983) (footnote omitted).

In applying the demand requirement over the years, courts have frequently not specified the *source* of the substance of the requirement. *See, e.g., Kaster v. Modification Systems, Inc.,* 731 F.2d 1014, 1017 (2d Cir.1984). Many federal courts have apparently assumed that the federal procedural rule establishes both the pleading guidelines as well as the substantive contours of the underlying demand requirement. *See, e.g., In re Kauffman Mutual Fund Actions,* 479 F.2d at 263; *Greenspun v. Del E. Webb Corp.,* 634 F.2d 1204, 1208–10 (9th Cir.1980); *see generally* C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure: Civil 2d § 1831 (2d ed. 1986).

More recently, however, some courts have begun to question whether in fact Rule 23.1 can be the source of the substantive requirement, or whether today *state* corporate law must provide the source of

---

**2.** As a conceptual matter, this inquiry can be separated from the procedural issue of pleading with particularity, which was the actual basis on which the district court dismissed Gaubert's complaint. But in practice the substantive contours of the demand requirement inform the procedural inquiry. In particular, Gaubert argues that the applicable demand requirement would be excused in Texas upon a showing of board acquiescence in the challenged action. If that substantive standard were found to be the

proper one, then the range of facts that Mr. Gaubert would have to plead would be considerably narrower than under a more stringent substantive standard.

**3.** In a requirement that is now embodied in Rule 23.1, the Court further ruled that "[t]he efforts to induce such action ... and the cause of failure in these efforts, should be stated with particularity...." *Id.* at 461.

the requirement.[4] *See, e.g., Lewis v. Curtis,* 671 F.2d 779, 785 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); *Cottle v. Hilton Hotels Corp.,* 635 F.Supp. 1094, 1097 (N.D.Ill.1986). These courts have found support in the Supreme Court's reasoning in *Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). There, the Court addressed the authority for directors to *terminate* derivative lawsuits, concluding that state law should control in the first instance. The Court stated that the fact that parties presented a federal question did not make state law irrelevant: while acknowledging that in certain areas it had held that federal statutes authorized the development of a complete body of federal law, the Court noted:

> Corporation law ... is not such an area.... [I]n this field congressional legislation is generally enacted against the background of existing state law; Congress has never indicated that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute.

*Id.* at 477–78, 99 S.Ct. at 1836–37 (citations omitted). Courts relying on state law for the substance of the demand requirement point to its underlying purpose as protecting the integrity of corporate self-governance, a touchstone of traditional corporate law.

Gaubert has attempted to draw this court into the dispute over the source of the demand requirement by arguing that the district court improperly imposed a more stringent standard than would have been applied under Texas law, which he argues should govern here.[5] Although current law sends conflicting signals as to the proper source of the substance of the demand requirement, we are not presently required to decide that issue: we discern no meaningful differences between the prevailing "federal" standard and the requirements that Texas courts have applied, and thus a decision as to which law prevails in this context is immaterial to the central issue on appeal—whether the dismissal of Gaubert's complaint should be affirmed.

Whether grounded in the correct source or not, a dominant national view of the basic demand requirement has emerged. Most jurisdictions in one way or another impose the general requirement that shareholders bringing a derivative action must first contact the board of directors and give the board the opportunity to pursue the litigation on behalf of the corporation. *See generally* Fletcher Cyc. Corp. § 5963

---

**4.** The Supreme Court has so far declined to decide this issue. *See Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 532 n. 8, 104 S.Ct. 831, 836 n. 8, 78 L.Ed.2d 645 (1984). In a separate concurrence in *Daily Income Fund,* Justice Stevens outlined his reasons for concluding that Rule 23.1 could not provide the substantive basis for the demand requirement:

> The rule that sometimes requires a shareholder to make an appropriate demand before commencing a derivative action has its source in the law that gives rise to the derivative action itself. Rule 23.1 ... merely requires that the complaint in such a case allege the facts that will enable a federal court to decide whether such a demand requirement has been satisfied; Rule 23.1 is not the source of any such requirement.... When the current Rule's predecessor was promulgated shortly after *Hawes,* it did not create a demand requirement—that had already been done by *Hawes.* Rather it operated to ensure that the pleadings would be adequate to enable courts to decide whether the applicable demand requirement had been satisfied.

*See id.* at 542–43, 104 S.Ct. at 841–42 (Stevens, J., concurring in the judgment). Justice Stevens went on to suggest this analysis is consistent with the Rules Enabling Act, 28 U.S.C. § 2072, which prohibits federal procedural rules from creating substantive rights. *See id.* at 544 n. 2, 104 S.Ct. at 842 n. 2.

**5.** At oral argument, Gaubert's counsel suggested that the district court *intended* Texas law to apply when it originally dismissed his action without prejudice to his subsequent filing in the United States District Court for the Northern District of Texas. However, it appears clear from the face of the district court's November 3, 1987, opinion that the court's preference for a Texas venue was grounded in the court's perception that all the relevant parties were in Texas, without regard to the applicability *vel non* of Texas law. Any ambiguity on this point was alleviated when on February 3, 1988, the court entertained a motion for reconsideration and for transfer of the case to the Northern District of Texas; the court at that juncture dismissed Gaubert's complaint with prejudice in all respects.

(perm. ed.). Several purposes have been cited to support the imposition of this requirement. As a general matter, the integrity of corporate self-governance is preserved if the board of directors is given an opportunity from the start to address the issues raised by a discontented shareholder. Thus, at its most fundamental, the demand requirement "furthers a principle basic to corporate organization, that the management of the corporation be entrusted to its board of directors." Comment, "The Demand and Standing Requirements in Stockholder Derivative Actions," 44 U.Chi.L.Rev. 168, 171 (1976); *see also Elfenbein v. Gulf & Western Industries, Inc.,* 590 F.2d 445, 450 (2d Cir.1978); *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.Sup. Ct.1984). In a more practical vein, the demand for relief may alert the board to problems of which it was unaware, and may cause it to champion the complainant's cause more directly, more efficiently, and/or more effectively than the shareholder could have done alone—perhaps without the need for litigation. The demand requirement also serves the goal of judicial economy, by giving the corporation a full opportunity to put its house in order before it is prematurely hauled into a court to account for its actions. *See generally* Principles of Corporate Governance § 7.03 (ALI Tent. Draft No. 6, 1986).

No jurisdiction's demand requirement is absolute, however. Rather, courts have recognized that there are times when insisting on demand will erect a needless barrier to valid shareholder litigation. In cases when demand would be futile, the requirement has been excused. *See Untermeyer v. Fidelity Daily Income Trust,* 580 F.2d 22, 23–24 (1st Cir.1978). There is, however, disagreement about the precise scope of the futility exception to the demand requirement. The predominant federal view is that the board of directors must have been actively involved in the alleged wrongdoing for demand to be excused: only when directors' actions demonstrate self-interest or some other form of

bias will most courts find that it is presumptively unlikely that they would respond fairly to a shareholder demand for corporate action. *See, e.g., In re Kauffman Mutual Fund Actions,* 479 F.2d at 265; *Greenspun,* 634 F.2d at 1210. In this view, mere "acquiescence" in the challenged act by the board of directors is not enough to show that the board will not consider the shareholder's petition fairly. *See Heit v. Baird,* 567 F.2d 1157, 1160 (1st Cir.1977); *accord In re Consumers Power Co. Derivative Litigation,* 111 F.R.D. 419, 424 (E.D.Mich.1986) ("[I]n a case where the directors have merely acquiesced or approved a transaction, even if they were grossly negligent in doing so, there is no irrebutable presumption that the directors would not consider a claim for relief.").

Indeed, as some commentators have noted, any less restricted exception to the demand requirement would likely eviscerate the doctrine: rare is the significant corporate act that has not in one way or another been "approved of" or "acquiesced in" by the board of directors. The "acquiescence" formulation casts the futility net too widely: if board intractability is to be presumed whenever there is board acquiescence, and shareholders are excused from approaching the board in these circumstances, there is virtually nothing left of the requirement that shareholders exhaust intracorporate remedies before a court will entertain a derivative action. *See In re Kauffman Mutual Fund Actions,* 479 F.2d at 265 ("If by plaintiff's merely alleging error, the directors are to be presumed incapable of exercising sound business judgment, Rule 23.1 would become virtually meaningless...."); *Lewis v. Graves,* 701 F.2d 245, 248 (2d Cir.1983). Nevertheless, some courts have used language that reflects acceptance of this less rigorous standard for demand futility. *See, e.g., Clark v. Lomas & Nettleton Financial Corp.,* 625 F.2d 49, 53 (5th Cir.1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1738, 68 L.Ed.2d 224 (1981).[6]

Gaubert argues that Texas law conforms to this more liberal "acquiescence" stan-

---

**6.** Appellant relies heavily on *Clark* for the proposition that Texas law conforms to the "acquiescence" standard. In fact, the *Clark* court's

analysis of the "'demand' requirements of Rule 23.1," 625 F.2d at 53, which was not the central issue before the court in that case, relied on

dard for demand futility. We disagree. In the seminal Texas case of *Cates v. Sparkman*, 73 Tex. 619, 621, 11 S.W. 846, 849 (1889), the Texas Supreme Court laid out, in an admittedly prolix sentence, the requirements to be imposed in these circumstances:

> The rule referred to, that it must be shown that the corporation refuses to sue, does not obtain where the allegations of the bill show that such request would have been useless, or if they show such facts as are tantamount to a "virtual refusal" to sue: as, where the fact of the complicity in the alleged fraud by the controlling officers of the company appears from the averments, so that the application would be unavailing, it need not be formally alleged to have been made[;] or that *the present board connived at and approved of the act complained of,* which the stockholder sought to impeach, it was held to be a sufficient excuse for not applying to the company. (Emphasis added, citation omitted.)

Far from suggesting that mere "acquiescence" by the board will excuse demand, the court advanced a much higher level of active involvement to show futility: the board must be shown to have "connived at" the alleged wrongdoing.[7] This language accords with the cases cited earlier that have required more than a showing of carelessness by the board, demanding instead that a shareholder show that the directors could not be trusted to exercise independent judgment regarding the corporation's best interests.

More recent Texas cases construing the demand futility exception further support this reading. In *Zauber v. Murray Savings Ass'n*, 591 S.W.2d 932, 936 (Tex. Civ.App.—Dallas 1979), *writ ref'd n.r.e.*, 601 S.W.2d 940 (Tex.1980), the court of civil appeals held that "[o]nly when it can be shown that *something beyond unsound business judgment has been exercised by the board of directors,* resulting in a wrongful refusal to act, will a shareholder be allowed to institute the suit on behalf of the corporation" (emphasis added).[8] The Texas court went on to conclude that "[t]he fundamental inquiry is whether the directors have such a personal interest in the controversy or are so controlled by the alleged wrongdoers that they could not reasonably be expected to diligently pursue the action." *Zauber,* 591 S.W.2d at 937; *accord Langston v. Eagle Publishing Co.,* 719 S.W.2d 612, 616–17 (Tex.App.—Waco 1986). In light of this precedent, we cannot credit Gaubert's position that under Texas law the fact of "directors' prior, affirmative approval of the act in question suffices to excuse demand." Reply Brief for Appellant at 13. Rather, we agree with the district court that something more than board acquiescence in the actions complained of must be present before demand will be excused.

**B.** *The Applicability of the Demand Requirement in the § 1464 Receivership Context*

Gaubert urges us to carve out an exception to the demand requirement for deriva-

---

other *federal* court decisions from several circuits, and did not discuss *Texas'* demand requirement. The court's comment (in dicta) that "[w]here ... the controlling shareholders are named defendants, demand 'futility' is presumed," *id.,* therefore does not guide this court as to Texas law, and lacks persuasive force insofar as it inadvertently gives an overly narrow reading to other cases that clearly do not stand for that proposition. *Compare In re Kauffman Mutual Fund Actions,* 479 F.2d at 264 ("The fact that the named defendants participated is not enough to excuse demand upon the directorate." (italics omitted)).

**7.** At oral argument, counsel for Gaubert referred to this passage but omitted the words "... connived at and...." When these words

are restored to their proper place, as they are in appellant's brief, there is considerably less support in the *Cates* court's language for the proposition that mere "acquiescence" or "approval" will excuse a plaintiff from the demand requirement.

**8.** In support of this interpretation of the demand futility exception, the *Zauber* court cited both *Cates,* discussed earlier, as well as a law review comment, "The Demand and Standing Requirements in Stockholder Derivative Actions," 44 U.Chi.L.Rev. 168, 169–74 (1976), which expressly noted that "[t]he majority of the cases have taken the view that unsupported allegations that the directors are controlled by the alleged wrongdoers are insufficient to excuse demand."

tive suits in which shareholders contest the appointment of a receiver by the FHLBB pursuant to 12 U.S.C. § 1464(d)(6)(A). In essence, Gaubert argues that the unique statutory setting of § 1464—in which the only power left in the board of directors following the appointment of a receiver is the authority to challenge that appointment, *see* 12 U.S.C. § 1464(d)(6)(A); *First S & L Ass'n v. First Federal S & L Ass'n,* 547 F.Supp. 988, 994 (D.Hawaii 1982)—somehow renders the board's views on the appointment of the receiver meaningless or irrelevant.

■ At the outset we note that whatever law—federal or state—governs the standards for excusing the demand requirement, Congress must evidence a clear intent to render that law inapplicable before we will read the demand requirement out of a particular statutory setting. If the demand requirement derives from Federal Rule 23.1 itself, some other statute will have to grant a clear exemption from the Rule: "In the absence of a 'clear inconsistency' or a demonstrated congressional purpose to exclude one or more of the Federal Rules, 'a subsequently enacted statute should be so construed as to harmonize with the Federal Rules if that is at all feasible.'" *Grossman v. Johnson,* 674 F.2d 115, 122–23 (1st Cir.) (*quoting* 7 Moore's Federal Practice, ¶ 86.04[4] at 86–22 (2d ed. 1980)), *cert. denied,* 459 U.S. 838, 103 S.Ct. 85, 74 L.Ed.2d 80 (1982). Conversely, if the content of the demand requirement derives from state law, as Gaubert argues so strenuously, then it will be preempted by a federal statute such as § 1464 only when there is a clearly evidenced congressional intent to do so, or when the state law is manifestly inconsistent with the policies or application of the federal law. *See Louisiana Public Service Comm'n v. FCC,* 476 U.S. 355, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986). Under either analysis, this court will not bypass the directive to demand or explain why not, unless Congress has clearly told it to do so in another statute.

■ Section 1464 itself contains no evidence that Congress sought to exempt shareholders from the strictures of the demand requirement. Rather, it provides that in the event of the appointment of a receiver, "the *association* may ... bring an action in the United States district court for the judicial district in which the home office of such association is located," or in the district court for District of Columbia. 12 U.S.C. § 1464(d)(6)(A) (emphasis added). If anything, this passage suggests that Congress fully expected that challenges to the appointments of receivers would originate in the board of directors. Moreover, there is nothing to indicate that Congress did not intend for Rule 23.1's pleading requirements to apply, and we do not see how application of the demand requirement is in any way "inconsistent" with the application of § 1464. Gaubert has not shown that a board will *never* or even in most cases not accede to a shareholder's demand to exercise its one remaining power and challenge a receiver's appointment.

Nor does Gaubert raise any countervailing federal interests that are jeopardized by adherence to the demand requirement. To the extent the 30–day limitation or the inherent financial difficulties of corporations in receivership render demand more difficult in the § 1464 context, the court itself can apply its discretion in determining what *effect* to give a board's refusal to pursue the action or failure to acknowledge the demand. A court may permissibly find, for example, that if a timely, good faith demand is made on the board and there is no response within the 30–day period allowed under § 1464(d)(6)(A), the shareholder should be permitted to pursue the action in a derivative capacity. Similarly, if a corporation's board of directors declines to pursue the litigation for lack of financial resources, a court may obviously consider this factor in deciding to permit the shareholder's suit to proceed. These are circumstances that argue in favor of flexibility in assessing the results of a demand requirement; they do not justify its wholesale abandonment. We therefore decline to create a per se rule excusing demand in

§ 1464 actions.[9]

## C. *The Requirement of Particularity in Pleading*

■ Having determined that the demand requirement applies to this cause of action, and that Gaubert is required to show something more than acquiescence in order to excuse demand on the ground of futility, we now address the procedural question of how particularized the plaintiff's pleadings must be in alleging that demand would have been futile. This inquiry invokes federal law, and Rule 23.1 requires substantially more than Rule 8(a) notice pleading. Most other courts that have confronted the question have held that mere allegations or conclusory statements regarding directors' dual allegiances, self-interest, or control by others is insufficient. *See, e.g., In re Kauffman Mutual Fund Actions,* 479 F.2d at 264 (holding that a plaintiff "must allege specific facts demonstrating the unmistakable link between the unaffiliated majority and the affiliated and allegedly wrong-doing minority"); *see also Greenspun,* 634 F.2d at 1209; *Lewis v. Graves,* 701 F.2d at 248. Rather, they have required "particularized allegations and specific facts," *Grossman,* 674 F.2d at 124, and "[a]s for mere 'participation' or 'acquiescence' by the directors in the [challenged behavior], that generality, too, is an insufficient excuse...." *Id. But see Liboff v. Wolfson,* 437 F.2d 121, 122 (5th Cir.1971) (holding that the bare allegation that a majority of the directors "participated, approved of and acquiesced in [the] transaction and are liable therefor" satisfied the requirement of particularity). Mere allegations of improper motives are especially inadequate when the challenged action is not *facially* suspect: if there are conceivably valid corporate reasons to explain the board's position, the plaintiff must clearly show the contrary. *See Heit v. Baird,* 567 F.2d at 1161–62.

■ In the instant case, we conclude that the district court was well within its discretion when it found that Gaubert's allegations of demand futility lacked the requisite particularity.[10] First, it is clear that the final board's crucial actions—acquiescence in and failure to challenge the appointment of a receiver for IASA—were not so facially improper that they compel the inference that the board was behaving improperly. By Gaubert's own account, IASA faced an enormous financial predicament in the spring of 1987, and the final board's actions were on the surface well within the realm of reasonable responses.

To overcome that impression of reasonableness, Gaubert offered nothing more than bare conclusions, *unsupported by detailed factual allegations,* that the final board was "a captive," that it "served at the sufferance of[ ] government regulators," that it was "beholden to" the state savings and loan commissioner, and that it was subject to "relentless pressure" to act

---

9. In his reply brief, Gaubert also argues that the appointment of a receiver constitutes a fundamental corporate change, which would ordinarily require ratification by the shareholders. He contends that it therefore serves no purpose to require demand upon the board, when the shareholders should have the final corporate say in the decision to acquiesce to the appointment of the receiver. But Gaubert has not persuasively shown that the appointment of a receiver falls into that relatively narrow category of "fundamental corporate changes" requiring shareholder approval. Indeed, § 1464(d)(6)(B) itself provides for appointment of a receiver at the request of the corporation's "board of directors *or* of its members" (emphasis added), which clearly suggests that Congress did not intend the statute to require shareholder approval. Although the appointment of a receiver can obviously be a critical *stage,* it does not fall among that class of changes where shareholders' approval is invariably required in order to protect them from some inherent risk of abuse at the hands of directors.

10. The standard of review we apply to the district court's dismissal is narrow: "Whether shareholders should be required to make demand as a prerequisite to maintaining a derivative action is addressed to the sound discretion of the court, ordinarily exercised on the basis of the allegations of the complaint." *Fields v. Fidelity Gen. Ins. Co.,* 454 F.2d 682, 684–85 (7th Cir.1971). "[T]he decision as to whether a plaintiff's allegations of futility are sufficient to excuse demand depends on the particular facts of each case and lies within the discretion of the district court." *Lewis v. Graves,* 701 F.2d 245, 248 (2d Cir.1983). Thus we will not disturb the district court's decision unless we find it to be an abuse of discretion.

as it did. Gaubert's complaint does not mention the size of the final board, much less name the directors or explain their individual relationships to the various regulators; nor does it specify the source of their bias or make specific allegations of self-dealing. And although the complaint asserts that the final board was a mere puppet of the FHLBB and others, it never suggests *any* reason to infer that the board members, once in place, lacked the independence to fulfill their fiduciary duties to the association.[11] Thus, although it is true that as a general matter courts should allow a shareholder derivative action to go forward even against the wishes of the board when the directors "stand in a dual relation which prevents an unprejudiced exercise of judgment," *United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 264, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917), Gaubert has not satisfactorily shown that this was the situation with IASA's final board of directors.

 Gaubert argues that if indeed the district court's decision to dismiss his complaint was based on a deficiency in pleading, then the court abused its discretion by not granting leave to file a second amended complaint. Leave to amend should ordinarily be freely granted to afford a plaintiff "an opportunity to test his claim on the merits," and a refusal to allow an amendment must be based on a valid ground. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). However, the Supreme Court has noted that when the amendments would not serve any purpose, the court is on solid ground in denying a motion for leave to amend. *Id.* The amended complaint proffered by Gaubert, *see* App. at 48–71, was declined by the district court on the ground that the "second amended complaint is not materially different from the first amended complaint" which had earlier been dismissed. *Gaubert v. General Home Loan Bank Board*, Civil Action No. 87–01682, Order at

2 (D.D.C. Feb. 12, 1988). We recognize that many commentators advocate a policy of liberally permitting repleading in circumstances such as these, *see* Principles of Corporate Governance § 7.03 (ALI Tent. Draft No. 6, 1986), but the decision in a particular case is left to the discretion of the district court. We have reviewed this amended complaint, and although we note that it does contain some additional facts (*e.g.*, the names of the members of the final board) and arguments (*e.g.*, asserting that the 30–day period for challenging the appointment of a receiver leaves insufficient time to make a demand), we conclude that the district court did not abuse its discretion by finding that the amended complaint failed to illuminate further the bases for the conclusory allegations of dominance and bias made in the first two complaints.

### III. CONCLUSION

The demand requirement is designed to require a shareholder to exhaust intracorporate remedies before bringing a corporate cause of action to the courts. The requirement reflects a judgment that a board of directors intimate with the facts of the case, possessing business expertise, and imbued with a legal duty to make evenhanded judgments that promote the corporation's best interests will usually be able to craft a resolution to a conflict with shareholders superior to a court's best effort. When, however, a plaintiff can provide the court with sufficient facts to justify an inference that the board is not worthy of that confidence and demand would be a pointless formality, the requirement may be excused as futile. On the other hand, when a plaintiff not only avoids making demand but then fails to provide the court with enough specific facts to demonstrate that demand would be futile, the plaintiff will not be excused from a requirement that in practical terms is not particu-

---

**11.** *Cf. Aronson v. Lewis*, 473 A.2d at 816 ("[I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corpo-

rate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence.").

larly daunting in the first place.[12]

Gaubert has made it clear that he had serious differences with IASA's final board. But without a particularized showing that the individual members of this board, who continued to operate under fiduciary duties of fidelity to IASA's best interests, could not or would not have granted an impartial hearing to Gaubert's demand for action, the district court was within its authority under Federal Rule 23.1 to dismiss his complaint.

*Affirmed.*

---

**12.** This case does not present the question of what consequences would have followed had the shareholder made a demand on the corporation's board of directors and the corporation had opted not to pursue the action. *Compare*

*Heit v. Baird,* 567 F.2d at 1162 n. 6 ("Resort to the board, even assuming the directors should turn down plaintiff's demand, would not necessarily preclude suit thereafter.").