Patrick James KNOWLTON, Plaintiff,

v.

UNITED STATES of America,
et al., Defendants.

No. CIV.A.96–2467 JGP.

United States District Court,
District of Columbia.

Sept. 9, 1999.

John Harrison Clarke, Washington, DC, for Patrick James Knowlton, plaintiffs.

William Mark Nebeker, Gordon Michael Harvey, U.S. Attorney's Office, Washington, DC, for U.S., Lawrence Monroe, Russel T. Bransford.

Dwight D. Murray, Jordan, Coyne & Savits, Washington, DC, Karen M. Kohn, Education Fund to End Hangun Violence, Washington, DC, for Ayman Alouri.

John Harrison Clarke, Washington, DC, for Kathryn Kaplan, movant.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

This matter arises out of an alleged conspiracy to obstruct justice into the investigation of the death of deputy White

House counsel Vincent Foster. Plaintiff alleges that, in furtherance of this conspiracy, defendants conspired to impede his testimony before the grand jury charged with investigating Mr. Foster's death. Pending before the Court are defendants' motions to dismiss, or alternatively for summary judgment, as well as plaintiff's motion to file a revised second amended complaint. For the reasons set forth below, defendants' motions for summary judgment will be granted, and plaintiff's motion to file an amended complaint will be denied.

## I. Background

Plaintiff filed this civil rights action against the United States, Federal Bureau of Investigation ("FBI") Agents Lawrence Monroe and Russel Bransford, Ayman Alouri, Abdel Salem Alouri, and John Does 1 through 24, alleging a conspiracy to obstruct justice. Plaintiff alleges that defendants conspired to intimidate him in connection with his testimony before the grand jury and that this conspiracy was subsidiary to a larger conspiracy to hide the facts of Mr. Foster's death.

Plaintiff alleges he was in Fort Marcy Park on July 20, 1993, the day Vincent Foster's body was discovered in that park. Plaintiff was interviewed at the time by an agent of the FBI. Over two years later, in October 1995, an article appeared in the London Sunday Telegraph in which it was reported that plaintiff believed his statements to the FBI regarding what he had seen in the park in July 1993 had been falsified. On October 26, two days after that article became available in the United States, plaintiff was served with a subpoena by the Office of Independent Counsel requiring him to appear before the grand jury on November 1.

Plaintiff alleges that on the same day he was served, the defendants "began a campaign of harassment, intimidation, terror, and psychological attack" in an effort to deter plaintiff from testifying fully and truthfully. Plaintiff alleges that the conspiracy against him began in April 1994, when defendant Monroe interviewed him and falsified statements he made regarding the events he witnessed in the park. Amend. Compl. ¶ 6. Specifically, Agent Monroe questioned plaintiff regarding the color of a Honda plaintiff had seen parked in the lot at Fort Marcy Park, attempting to discern whether the Honda with Arkansas license plates that plaintiff had seen could have been Mr. Foster's car. Amend. Compl. ¶ 18. Plaintiff insisted it could not have been, because the car he had seen was older than Mr. Foster's 1989 Honda, and was rust-brown, not taupe like Mr. Foster's car. *Id.* Agent Monroe interviewed plaintiff a second time, in May 1994, and subsequently prepared reports of plaintiff's statements, in which plaintiff alleges Agent Monroe "knowingly and with specific intent to obstruct justice, falsified Plaintiff's account" of the car he had observed. *Id.* ¶ 20.

Plaintiff alleges that on October 13, 1995, an investigative journalist showed him for the first time the written summaries of his statements prepared by Agent Monroe. Amend. Compl. ¶ 25. On October 22, an article appeared in the London Sunday Telegraph, reporting that plaintiff was in Fort Marcy Park on the day Mr. Foster's body was discovered, and that he was "stunned" to see the official summaries of his statements, alleging they were falsified. Amend. Compl. ¶ 26. On October 26, two days after the London Sunday Telegraph article was available in the United States, plaintiff was served by Agent Bransford with a subpoena to testify before the grand jury on November 1. Amend. Compl. ¶ 27.

Plaintiff alleges that when the story was published in the London Sunday Telegraph, in which plaintiff indicated that his statements had been falsified, defendants "conspired and schemed to neutralize Plaintiff's statements, both made and anticipated." Amend. Compl. ¶ 30. The purpose of this conspiracy, according to plaintiff, was "to neutralize any dam-

age Plaintiff could do to the ongoing conspiracy to hide the circumstances of Mr. Foster's death," by "intimidating and warning" plaintiff, and failing that, by "destabilizing and discrediting" him. Amend. Compl. 30. The ensuing "campaign of harassment, intimidation, terror, and psychological attack" began, according to plaintiff, on the same day he was served with a subpoena, October 26, 1999. Amend. Compl. ¶¶ 31, 32. On the evening of October 26, as plaintiff and a companion, Kathy,[1] walked on a public street, John Doe One ("ONE") walked toward them and stared directly at plaintiff, directing a "fierce glare" toward plaintiff. Amend. Compl. ¶ 33. After plaintiff and his companion passed, ONE "raised his left wrist to his mouth and spoke into his coat sleeve" as he continued to stare at plaintiff. *Id.* In the following minutes, John Does TWO through ELEVEN followed or approached plaintiff, directing "fierce" stares his way. Amend. Compl. ¶¶ 34-51. One of the John Does, EIGHT, made physical contact with plaintiff, brushing against him as he passed. Amend. Compl. ¶ 43.

The alleged harassment continued the following day, October 27. Amend. Compl. ¶ 52. That morning, plaintiff and Kathy were walking on the street when a black Nissan Altima with Maryland plates drove past them. John Doe TWELVE, who was driving the car, and THIRTEEN a passenger, each stared directly at plaintiff. Amend. Compl. ¶ 52. Plaintiff alleges, upon information and belief, that the car driven by TWELVE was a federal government vehicle. *Id.* ¶ 53. Later than afternoon, plaintiff walked with another individual, Christopher Ruddy, and was again approached by strangers. *Id.* ¶ 54. Plaintiff describes his first encounter that afternoon, with John Doe FOURTEEN, as follows:

> Approximately two minutes after [plaintiff and Mr. Ruddy] left Plaintiff's building, Defendant FOURTEEN crossed

the street so that they all reached the corner at the same time. FOURTEEN glared at Plaintiff, raised his eyebrows and from the waist pointed his finger at Plaintiff as if to say "gotcha." FOURTEEN then walked on. Ruddy approached FOURTEEN, produced his journalist ID, and spoke to FOURTEEN, whereupon FOURTEEN introduced himself as "Joe Colter," and said he had worked at the White House, a World Bank organization, as an advisor to Bill Clinton, and currently at an international technology business.

> FOURTEEN reintroduced himself and shook Plaintiff's hand while saying, "I didn't hear your name." Plaintiff repeated "Patrick Knowlton," whereupon FOURTEEN gave Plaintiff's hand a hard squeeze and while leaning forward and glaring into his eyes, said, "Nice to meet you, Mr. Knowlton."

Amend. Compl. ¶¶ 54-55. Plaintiff states that he understood FOURTEEN's finger point to be a "direct threat of harm." *Id.* ¶ 56.

The harassment continued. John Doe FIFTEEN watched plaintiff's interaction with FOURTEEN, and then approached plaintiff and "stared at [his] face for about thirty seconds." Amend. Compl. ¶ 57. Following, this encounter, plaintiff alleges he was harassed by two of the named defendants, Ayman Alouri and Abdel Alouri. Plaintiff alleges that as he and Mr. Ruddy continued to walk, a white Honda with Virginia plates stopped in a no-parking zone. Amend. Compl. ¶ 59. The driver, Ayman Alouri, and the passenger, Abdel Alouri, "continuously stared in Plaintiff's direction as Plaintiff crossed in front of the car and proceeded around the [traffic] circle." *Id.* Ayman Alouri then drove the car slowly around the circle, as Abdel Alouri continued to glare at plaintiff. *Id.* Seconds later, Ayman Alouri and Abdel Alouri passed plaintiff again, and stopped the car about sixty feet

---

1. "Kathy" has requested that her identity re- main confidential, unless and until necessary.

ahead. Amend. Compl. ¶ 59. The men then "adjusted the car mirrors so as to watch plaintiff." *Id.* Just before the car drove away, plaintiff and Mr. Ruddy noted the license plate number. *Id.*

Following his encounter with Ayman Alouri and Abdel Alouri, plaintiff alleges he was followed and/or stared at by a number of other John Does. These encounters involved John Doe SIX, whom plaintiff had recognized from the day before, and John Does SIXTEEN, SEVENTEEN, EIGHTEEN, NINETEEN, TWENTY, and TWENTY–ONE. Plaintiff additionally alleges that at one point, SIXTEEN and EIGHTEEN were speaking to each other, and SIXTEEN subsequently "raised his left wrist to his mouth and spoke into his coat sleeve." Amend. Compl. ¶ 66. Mr. Ruddy approached SIXTEEN and asked whether he worked for a federal law enforcement agency, to which SIXTEEN replied "something like that." *Id.* Plaintiff also alleges that NINETEEN bumped into a chair in which plaintiff was seated, and then walked past him, glaring. Amend. Compl. ¶ 69.

Later on the afternoon of October, 27, 1995, plaintiff reported the alleged pattern of harassment and intimidation to the FBI. Amend. Compl. ¶ 74.

On the following day, October 28, 1995, plaintiff alleges he was harassed by defendants John Does TWENTY–TWO and TWENTY THREE. TWENTY–TWO allegedly knocked on plaintiff's door at 12:15 a.m. and left when plaintiff inquired who it was. Amend. Compl. ¶ 75. Plaintiff believes that TWENTY–TWO also had called his apartment from the lobby phone several times earlier in the evening, each time hanging up when the phone was answered. *Id.* TWENTY–THREE allegedly followed plaintiff down the street, increasing and slowing his speed to keep pace with plaintiff. *Id.* ¶ 76.

On Monday, October 31, 1995, three days after plaintiff complained to the FBI about the alleged pattern of harassment, plaintiff was contacted by defendant FBI Agent Bransford. Amend. Compl. ¶ 78. Agent Bransford agreed to visit plaintiff, and agreed to call plaintiff in advance of his visit so that plaintiff could have his attorney present for their meeting. Amend. Compl. ¶ 78. Later the same day, plaintiff alleges that Agent Bransford called from his car just outside of plaintiff's building, and "reluctantly" agreed to wait until plaintiff's lawyer arrived. Amend. Compl. ¶ 79. Plaintiff alleges that he hung up the phone after speaking with Agent Bransford and picked the phone up to call his lawyer, but that his phone line was dead. ¶ 79. Minutes later, Agent Bransford appeared at plaintiff's door, and allegedly stated that if plaintiff's phone was tapped, plaintiff would not know, because such taps are undetectable. Amend. Compl. ¶ 80. Plaintiff describes the remainder of his interaction with Agent Bransford as follows:

> After displaying his weapon, Agent Bransford refused to provide plaintiff protection, explained that he worked under Fiske, that he was kept on under Starr, and that he worked with Agent Monroe. During their conversation, Agent Bransford grinned at Plaintiff as if he knew exactly what had happened to Plaintiff. In response to Plaintiff's question whether Plaintiff should trust him, Agent Bransford responded, "I don't know, Mr. Knowlton, that's a good question." Plaintiff ordered Agent Bransford out of his home, whereupon Plaintiff's telephone rang and his telephone service was immediately restored.

Amend. Compl. ¶ 80.

Plaintiff alleges that Agent Bransford "purposefully disabled" his telephone in order to prevent him from contacting his attorney. Amend. Compl. ¶ 81. He further asserts that Agent Bransford "was carrying a wireless transmitter and that another FBI Agent was monitoring their conversation, and that this other FBI Agent called Plaintiff's telephone number to signal Agent Bransford to exit Plain-

tiff's apartment when Plaintiff became upset and ordered Agent Bransford out of Plaintiff's apartment." Amend. Compl. ¶ 81.

Plaintiff testified before the grand jury, as scheduled, on November 1, 1995. Amend. Compl. ¶ 83. Plaintiff alleges that the prosecutors questioning him had been informed, prior to his testimony, about plaintiff's allegations of being harassed by more than twenty-five individuals. *Id.* Plaintiff alleges his belief that he had been discredited, stating that prosecutors did not believe his "bizarre account of being harassed, at one point asking Plaintiff to 'tell us a little bit about the alleged harassment.'" Amend. Compl. ¶ 83.

On November 2, the day following his testimony, plaintiff observed defendant John Doe TWENTY–FOUR standing outside of plaintiff's apartment building. Amend. Compl. ¶ 84. TWENTY–FOUR "made eye contact with Plaintiff, acted startled and immediately turned around and walked out the door." *Id.* Outside of the building, plaintiff watched as TWENTY–FOUR reached into a bag, and then, immediately upon making eye contact once more with plaintiff, quickly pulled his hand out of the bag and turned and ran. *Id.* Plaintiff states that when he saw TWENTY–FOUR reach into his bag, he feared he might be shot. Amend. Compl. ¶ 85.

### The Charges

Plaintiff's complaint contains five counts. Count I charges all defendants, the United States, Agents Monroe and Bransford, Ayman Alouri and Abdel Salem Alouri, and John Does Numbers One through Twenty–Four, with conspiracy to interfere with his civil rights and obstruction of justice in violation of 42 U.S.C. § 1985(2). The remaining claims allege state law violations: intentional infliction of emotion distress (Court II, against all defendants); assault (Count III, against John Does 5–10, 14–17, 19, 20, 24); battery (Count IV, John Does 8 and 19); and civil conspiracy (Count V, all defendants).

## II. Discussion

### A. Status of Defendants United States of America and Federal Agents in their Official Capacities

Plaintiff's initial complaint and his first Amended Complaint included as defendants the United States of America and two federal agents in their official (and individual) capacities. These Federal Defendants moved to dismiss the case in part because § 1985 does not apply to actions against the United States, and because as to the remaining claims, plaintiff had failed to exhaust his administrative remedies as required by the Federal Tort Claims Act. In his responding papers, and at oral argument, plaintiff did not dispute defendants' position. *See* Plaintiff's Opposition at vii ("Defendants correctly assert that Plaintiff has failed to adhere to the jurisdictional mandates of the FTCA, as well as exhaust his administrative remedies under the FTCA, and that Plaintiff's claims against the United States are therefore not yet properly before this Court."); Transcript of Motions Hearing ("Tr.") at 11–12 (plaintiff's counsel's statement that "Plaintiff has not opposed the defendant's motion to dismiss the United States, but for somewhat different reasons than the defendant claims."). Indeed, plaintiff's proposed revised Second Amended Complaint drops the United States as a defendant to this action. *See* Plaintiff's Motion for Leave to File Revised Second Amended Complaint ¶ 7 ("During oral argument, plaintiff apprised the Court that he did not oppose the motion to dismiss the United States as a defendant because plaintiff had not yet exhausted his administrative remedy under the Federal Tort Claims Act."); *see also* Revised Second Amended Complaint (failing to name United States as a defendant). Moreover, although plaintiff apparently does not concede to dismissal of the federal agents in their official capacity, *see* Plaintiff's Opposition at vii, a suit against federal officers in their official capacities is a lawsuit against the United States, and so

this action must be dismissed as against the agents in their official capacities as well.[2] *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Graves v. United States,* 961 F.Supp. 314, 318 (D.D.C.1997). Therefore, to the extent the Federal Defendants move to dismiss the United States and the agents in their official capacities, the motion to dismiss is granted.

**B. Section 1985(2) Claim against Agents Monroe and Bransford in their Individual Capacities, and Defendants Ayman Alouri and Abdel Salem Alouri**

Pending before the Court are defendants' motions to dismiss, or in the alternative, for summary judgment. Because the parties have submitted documents, including affidavits, in support of their positions and the Court has considered these submissions, the motions will be treated as ones for summary judgment. *See* Fed. R.Civ.P. 12(b) (stating that if on a motion to dismiss for failing to state a claim upon which relief may be granted, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56"). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–2510, 91 L.Ed.2d 202 (1986). In opposing a properly supported motion for summary judgment, plaintiff cannot rely on mere allegations, but "must set forth specific facts showing that there is a

genuine issue for trial." Fed.R.Civ.P. 56(e). All "justifiable inferences" will be drawn in favor of the non-moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. However, in order to survive a motion for summary judgment, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511. Evidence that is "merely colorable" or which "is not significantly probative," will not suffice to defeat an otherwise appropriate motion for summary judgment. *Id.* at 249–250, 106 S.Ct. at 2511.

■ The sole federal claim before this Court is an alleged violation of 42 U.S.C. § 1985(2). The essential elements of a § 1985(2) claim are (1) a conspiracy between two or more persons, (2) to deter a witness by force, intimidation or threat from attending court or testifying freely, fully, and truthfully in any pending matter, which (3) results in injury to the plaintiff. *See, e.g., Brever v. Rockwell Int'l Corp.,* 40 F.3d 1119, 1126 (10th Cir.1994); *Chahal v. Paine Webber Inc.,* 725 F.2d 20, 23 (2d Cir.1984); *Graves v. United States,* 961 F.Supp. 314, 319 (D.D.C.1997). Defendants[3] contend that plaintiff fails sufficiently to allege a conspiracy. Specifically, defendants argue that although plaintiff vaguely alleges a meeting of the minds, he fails to identify specifically what constituted the alleged agreement, relying instead on a clustering of events. Plaintiff does not dispute that an agreement among conspirators is a required element of a conspiracy claim. Rather, he states that an agreement may be inferred from circumstantial evidence, including a pattern of events, and that his complaint alleges sufficient facts to maintain a conspiracy claim.

---

2. In any event, as discussed below, the claims against Agents Monroe and Bransford must be dismissed because plaintiff fails to tie them to any conspiracy.

3. Ayman Alouri and the Federal Defendants separately filed motions dismiss or for sum-

mary judgment. With respect to plaintiff's § 1985 claim, Defendant Alouri for the most part defers to the government's arguments. For purposes of the Court's discussion, all defendants will be considered together.

**8**

In order to establish a conspiracy, plaintiff must allege facts showing the existence of an agreement, or "meeting of the minds", between defendants to violate plaintiff's civil rights. *See Graves*, 961 F.Supp. at 320–21; *Moss v. Perkins*, 682 F.Supp. 395, 396 (N.D.Ill.1988) (stating that in order to plead a conspiracy, plaintiff must allege facts that would support a conclusion that defendants "actually possessed the same motives or objective"). Conclusory assertions will not suffice. *See Graves*, 961 F.Supp. at 320–21; *Moss*, 682 F.Supp. at 396 ("Mere conclusory pleadings that the parties 'agreed and conspired' to deprive [plaintiff] of his constitutional rights are insufficient to state a cause of action for conspiracy.") *Simms v. Reiner*, 419 F.Supp. 468, 474 (N.D.Ill.1976) (finding reliance on "entire cluster of events" insufficient to establish a conspiracy, stating that "unsupported conclusions and inferences are insufficient to support a charge of conspiracy").

After reviewing the evidence in the light most favorable to the plaintiff, the Court concludes that he has failed to raise issues of material fact regarding an agreement, or "meeting of the minds", by any defendant.

### *Monroe*

Defendant Monroe is alleged to have falsified statements plaintiff gave during an interview following the discovery of Vincent Foster's body. These acts, according to plaintiff's complaint, began the conspiracy against him. Plaintiff essentially complains that although he insisted during the interview that the car he saw in the park was older and a different color than Foster's car, Agent Monroe "knowingly and with specific intent to obstruct justice, falsified Plaintiff's account" of the car. Plaintiff also apparently objects to "repeated" attempts by Monroe "to obtain an admission" from him that the car he saw could have been Foster's car and asserts that, failing to get that admission, Monroe subsequently falsified his reports of plaintiff's statements. *See* Plaintiff's Opp. to Fed. Defendants' Motion to Dismiss at 2–3 (referring to these activities as overt acts in furtherance of the conspiracy).

Initially, the Court rejects plaintiff's characterization of Agent Monroe's reports of plaintiff's statements. A review of the forms, known as "FD–302"s, which memorialize plaintiff's statements, makes it abundantly clear that Agent Monroe reported that plaintiff believed that the car he saw was older than Foster's car and was brown or rusty brown in color. The FD–302 dated April 18, 1994, which related to an April 15, 1994 interview, did indicate that plaintiff identified the vehicle as "a 1988–1990 brown or rusty brown" Honda. Exhibit 1, attached to Federal Defendants' Motion. However, the report also indicated that after "closely scrutinizing" photographs of Mr. Foster's car, plaintiff stated that "it was his opinion that this vehicle [which he had observed] was either brown or rust brown in color and appeared to be an older vehicle than the photographs he was exhibited." *Id.* at 3. The report continued, emphasizing plaintiff's belief about the age of the car: "In fact, [plaintiff] stated that after viewing television reports the evening of July 20, 1993 in which Mr. Foster was identified as a White House lawyer, he remembered thinking to himself that due to the age of this vehicle it was not, in his opinion, a vehicle typically driven by a lawyer." *Id.*

Plaintiff was subsequently reinterviewed by Agent Monroe, and the FD–302 relating to this interview also makes it clear that plaintiff believed the car he observed was older than Mr. Foster's car. *See* Exhibit 2, attached to Federal Defendants' Motion (FD–302 dated May 12, 1994, for interview conducted May 11, 1994). That report states that after plaintiff was informed of conflicting witness statements and again shown photographs, plaintiff "still believes that the vehicle he observed during the period of time he was in Fort Marcy Park on July 20, 1993 was brown in

color and still believes looked 'older' than Mr. Foster's 1989 four door Honda Accord." *Id.* at 2. The report further states that plaintiff also believed that the vehicle he saw was "shorter in length or more compact than the photographs of Mr. Foster's 1989 Honda and further believed that the color of the vehicle had a flat finish and was not glossy or clear coated as represented in the photographs of Mr. Foster's 1989 Honda." *Id.* Thus, it is absolutely clear upon reading the FD–302s, as dictated by Agent Monroe, that plaintiff strongly believed that the vehicle he observed in the park that day, although also a Honda with Arkansas plates, was not the same car as that driven by Vincent Foster. It is clear that plaintiff believed and reported to Agent Monroe that the car he saw was older and of a different color than Foster's car.

Plaintiff takes issue with certain of the wording in the report.[4] The fact that Agent Mornoe did not memorialize plaintiff's statement precisely the way plaintiff might have liked is not itself evidence of his tie to a conspiracy to obstruct justice. Plaintiff also focuses on the statements in the FD–302s that he identified the car as a 1988–1990 Honda. (Foster's car was a 1989 Honda Accord.) Plaintiff offers this as evidence that Monroe falsified his statements in an effort to obstruct justice. Again, however, a simple review of the FD–302s makes it abundantly clear that plaintiff repeatedly reported that the vehicle he saw could not have been Mr. Foster's car.

Plaintiff additionally objects to Monroe's "repeated" interviews, characterizing them as an attempt to get an admission from plaintiff that the car he had seen could have been Foster's car. However, as even plaintiff acknowledges, this is consistent with good police work. *See* Tr. at 16.[5] Witnesses are often reinterviewed, particularly where their eye-witness accounts differ from the accounts of others or from other facts gathered by the investigators. Moreover, plaintiff's allegation that Monroe falsified plaintiff's statements when he failed to obtain an admission from plaintiff that Foster's car could have been in the parking lot when he was there, is belied by the report itself. As noted, even the second report by Agent Monroe makes it clear, indeed reinforces, plaintiff's firm belief that the car he observed was not Foster's car.

Plaintiff has also failed to present any evidence of an agreement between Agent Monroe and any other alleged conspirator. The mere fact that Agent Monroe works for the FBI as does Agent Bransford, *see, e.g.,* Plaintiff's Opp. to Federal Defendants' Motion to Dismiss at 8, n. 14, is not sufficient to raise a triable issue of agreement. *Cf. Wesley v. Don Stein Buick, Inc.,* 996 F.Supp. 1299, 1308 (D.Kan.1998) (refusing to infer a meeting of the minds between two alleged conspirators on the basis that the two worked in the same police department); *see also Moss,* 682 F.Supp. at 396 (finding that a conspiracy cannot be inferred based only on the facts that two defendant police officers were partners, both were present during the alleged incident, and that one failed to intervene as the other assaulted the plaintiff). Plaintiff simply offers no evidence, other than the

---

4. For example, plaintiff challenges Monroe's statement, in the FD302, that plaintiff "indicated that the car he saw looked like an older model," arguing that "Plaintiff repeated unequivocally told Defendant Monroe that the car he saw was definitely not the same one depicted in the photographs. Plaintiff did not 'indicate' that the car he saw 'looked like' an older model." Plaintiff's Statement of Genuine Issues and Material Facts in Dispute ¶ 21.

5. After relating that plaintiff was "repeatedly" questioned and "leaned on" by Monroe, plaintiff was asked by the Court whether that wasn't good investigative work. Plaintiff's counsel responded "Yes, your honor, perhaps it is, but Monroe falsified these reports, having failed to obtain that admission." Tr. 16. As discussed earlier, although the report states that plaintiff identified a 1988–1990 Honda, it also very clearly and without equivocation relates that plaintiff believed the car he saw to be older than Mr. Foster's car.

purported falsification of the reports, from which a reasonable juror could determine that Agent Monroe was involved in a conspiracy to obstruct justice into the investigation of the death of Vincent Foster, as alleged by plaintiff.

Plaintiff emphasizes that his theory against Agent Monroe is one of vicarious liability. *See, e.g.*, Plaintiff's Opposition to Defendant Ayman Alouri's Motion to Dismiss at 6 (comparing Alouri's liability as a principle to Agent Monroe, who plaintiff states "is vicariously liable only under the law of civil conspiracy"); Plaintiff's Opposition to Federal Defendants' Motion to Dismiss at 12–16. That is, plaintiff alleges that Monroe is liable for the subsidiary conspiracy based on his involvement in the broader conspiracy to obstruct justice, and because the subsidiary conspiracy was foreseeable. As discussed, however, there is nothing in the record sufficient to support an inference that Monroe was party to any overarching agreement to obstruct justice.

■ For these reasons, the Court determines that there are no triable issues of fact from which a reasonable fact-finder could determine that Agent Monroe agreed with one or more persons to obstruct justice into the investigation of the death of Vincent Foster. There is simply nothing in the FD–302s, or otherwise related to Agent Monroe, to support an inference of a "meeting of the minds" with respect to an overall conspiracy.

*Bransford*

Plaintiff's allegations against Agent Bransford stem from two interactions, the first when Agent Bransford served plaintiff with a subpoena, and the second when Agent Bransford appeared at plaintiff's home in response to plaintiff's complaints to the FBI. Plaintiff seems to suggest that the fact that Agent Bransford served plaintiff with the grand jury subpoena, indeed, the fact that plaintiff was subpoenaed at all, is evidence of Agent Bransford's involvement in the alleged conspiracy. There is simply no basis for this assertion. Agent Bransford served plaintiff with a valid subpoena with respect to a valid, on-going investigation. There is nothing about that action that suggests, even remotely, any connection to an overall conspiracy, even if one existed. To the extent plaintiff challenges the timing, this also is insignificant. First, Agent Bransford would not have been the individual to make the determination of when to issue a subpoena, and there is no evidence that he did so. Second, plaintiff suggests there is something ominous in the timing of the subpoena because it occurred "immediately in response" to the article in which plaintiff reported that the FBI fabricated his statements. *See* Plaintiff's Opposition to Federal Defendants' Motion to Dismiss at 3 (listing as an overt act the allegation that the FBI subpoenaed plaintiff in "immediate response" to the article); *see also* Tr. at 17. Again, this appears to be nothing more than the conduct of an ordinary investigation. There is certainly nothing in the timing to indicate a conspiracy to *prevent* plaintiff's account from becoming part of the record, and nothing, more importantly, to suggest that Agent Bransford is somehow a part of such a conspiracy.

■ The bulk of plaintiff's allegations regarding Agent Bransford's connection to the conspiracy arise from an interaction plaintiff had with him on Monday, October 31, 1995, when Agent Bransford contacted plaintiff regarding plaintiff's complaints of harassment. Initially, plaintiff suggests something sinister or conspiratorial about the fact that it took three days for the FBI to respond to his complaints of harassment. *See, e.g.*, Plaintiff's Statement of Genuine Issues and Material Facts in Dispute ¶ 6 ("Whether the FBI failed and refused to respond to Plaintiff's pleas for help until after the harassment had ceased and whether this failure was to facilitate the 42 U.S.C. § 1985(2) violation alleged."); Tr. at 18 ("plaintiff did call, he repeatedly

called, but the FBI refused to respond to his repeated pleas for help until the following Monday"). However, plaintiff offers nothing to support such an inference. There is nothing to suggest, for example, that the FBI does not normally take three days to respond to complaints in the nature of those made by plaintiff. Plaintiff's complaints to the FBI did not include incidents involving weapons, violence, or overt threats, and there is nothing inherently unreasonable about the FBI responding three days after hearing about a series of "fierce glares", especially absent any evidence that such reported threats are ordinarily treated more expeditiously. There is certainly nothing, in any event, to suggest that Agent Bransford himself made the decision of when to respond. *See* Amend. Compl. ¶ 74 (alleging that "Agent Bransford's *superiors* received actual notice that Plaintiff was the target of an orchestrated campaign of harassment and intimidation," and that the FBI "failed and refused" to respond immediately) (emphasis added).

■ Plaintiff's assertions regarding the actual visit with Bransford also fail to support an inference that Bransford conspired to violate § 1985(2). Plaintiff alleges that Agent Bransford failed to call in advance of his visit and then failed to wait for plaintiff's counsel to arrive, as the agent had promised he would, before arriving at plaintiff's apartment. Plaintiff also alleges that Agent Bransford caused plaintiff's phone to be disabled in order to prevent plaintiff from contacting his attorney, and, once he was inside the apartment, that

Bransford made a number of comments that left plaintiff unnerved.

Plaintiff's allegation that Agent Bransford somehow remotely disabled his phone is completely conclusory. *See* Amend. Compl. ¶ 81 ("*Upon information and belief,* Plaintiff avers that Agent Bransford purposely disabled Plaintiff's telephone . . . .") (emphasis added); Tr. at 19–20.[6] The remaining details of the interaction plaintiff describes are for the most part completely consistent with proper FBI business, and are not grounds for a reasonable inference of an involvement in a conspiracy to hinder plaintiff's testimony. There is no requirement that grand jury witnesses have counsel present when speaking with FBI agents, and Agent Bransford's failure to wait for plaintiff's counsel, even if he had promised to do so as plaintiff alleges, may be indicative of the agent's impatience, rudeness, or poor judgment. It does not, however, indicate any agreement with others to participate in an effort to intimidate plaintiff. Perhaps if these allegations were combined with other evidence of Agent Bransford's interaction with co-conspirators, or some other evidence of his participation in a conspiracy, then his failure to wait and even his comments once in the apartment might be said to be further support of a conspiracy. On their own, however, they do not raise such an inference. Plaintiff asks the Court to consider Agent Bransford's actions in the context of the remainder of his allegations, which the Court of course has done. However, plaintiff fails to connect Agent Bransford to any of the unnamed defendants, to the Alouris, or to any mo-

6. The following colloquy between plaintiff's counsel and the Court occurred at oral argument:

Counsel: [W]e allege that the FBI disconnected plaintiff's telephone. . . . [Agent Bransford] knew that plaintiff would be unable to contact me, because he had disconnected plaintiff's telephone.
The Court: How did he disconnect plaintiff's telephone?
Counsel: Your honor, I don't know. It's my understanding that the FBI has the

capability to disconnect from a remote location a telephone, so it can't be used, either incoming or outcoming telephone calls.
The Court: You say it's your understanding?
Counsel: I don't have anything—
The Court: You have nothing to support the allegation that the FBI did disconnect the phone; is that right?
Counsel: Only the sequence of events, the circumstances.

Tr. at 19–20.

tive for participating in a conspiracy. His connection to Agent Monroe and to the FBI alone is not sufficient.

### Ayman and Abdel Alouri

■ Plaintiff alleges that among the persons who glared at him prior to his grand jury testimony were Ayman Alouri and Abdel Salem Alouri, who drove by plaintiff in a white Honda. The men allegedly "continuously stared in Plaintiff's direction as Plaintiff crossed in front of the car," and subsequently watched plaintiff in the car's mirrors. Amend. Compl. ¶ 59.

Initially, Abdel Salem Alouri has never been served in this action. Thus, plaintiff's allegations against this defendant will be dismissed. *See* Fed.R.Civ.P. 4(m). With respect to Ayman Alouri, plaintiff again fails to allege, and in response to motions for summary judgment fails to come forward with any evidence of, an agreement of any sort between Mr. Alouri and any other defendant in this action. Even if the facts alleged by plaintiff were proven to be true,[7] that is, that Mr. Alouri and a passenger drove past plaintiff in a traffic circle and stared at him, and then watched him in the car mirror, this would not be sufficient to support a conspiracy claim against Mr. Alouri. Plaintiff does not allege any connection whatsoever between Mr. Alouri and any other conspirator. He relies completely on the pattern of events and this simply is not sufficient. The behavior alleged by plaintiff is consistent with behavior occasionally observed in a big city and absent any evidence of a meeting of the minds, indeed of any connection whatsoever to any other conspirator, plaintiff's allegations must be dismissed.

### C. Plaintiff's Reliance on the "Entire Series of Events"

■ Plaintiff's arguments stray from the named individuals in his complaint, and he attempts instead to rely on the circumstances and timing of the alleged events. Plaintiff emphasizes that when everything is taken together, when the events are considered in tandem, there is sufficient evidence of a conspiracy to submit to a fact finder. His argument ultimately is unpersuasive. Plaintiff relies heavily on *Brever*, from which he quotes the following passage:

> While more than mere conclusory allegations are required to state a valid claim, "the nature of conspiracies often makes it impossible to provide details at the pleading stage and ... the pleader should be allowed to resort to the discovery process and not be subject to dismissal of his complaint."

*Brever*, 40 F.3d at 1126 (citation omitted).

The instant case is quite distinguishable from *Brever*, however. The conspiracy alleged in *Brever* involved threats and intimidation directed at two employees of a plutonium plant. The plant was being investigated by the FBI, and the plaintiff employees were believed to be "whistleblowers." At a staff meeting, which was attended by several of the named defendants, one of the plaintiffs was told not to cooperate with the FBI. She responded that she would not lie if interviewed by the FBI. The next day, plaintiffs were refused access to important documents. In a subsequent staff meeting, a manager stated that whistleblowers would be "dealt with severely and completely." Plaintiffs alleged that thereafter, defendants began a "campaign of harassment, intimidation, terror, ...." The alleged acts of intimidation included threats of harm, publication of false charges that plaintiffs were

---

7. Mr. Alouri disputes the factual allegations. He submitted an affidavit stating that he has never owned a white Honda and was not driving a white Honda on October 25, 1995; he also states that he was not aware of and did not engage in any conspiracy and did not even know of the grand jury subpoena served upon the plaintiff. Affidavit of Ayman Alouri, attached as exhibit to Alouri's Memorandum of Points and Authorities in Support of Defendants Motion to Dismiss or in the Alternative Motion for Summary Judgment.

whistleblowers, repeated assignment to excessively hazardous duties, and sexually harassing body contact. *Brever,* 40 F.3d at 1123. In one instance, plaintiffs were intentionally exposed to radiation, after which two defendants laughed and stated "That's what you get for making waves." *Id.* at 1124. The Tenth Circuit held that plaintiff's allegations were sufficient to create an inference of an agreement or a "meeting or the minds" by the conspirators. *Id.* at 1127. The court noted the timing of the two staff meetings, the comments management made at each meeting, and the period of harassment that immediately followed. This was sufficient, the court explained, to support an inference of a meeting of the minds between management and the individual defendants that action should be taken against whistleblowers without fear of reprimand. *Id.* at 1128.

Although plaintiff is correct that he would be entitled to allege an agreement by inference, this case is quite different than *Brever.* Unlike in *Brever,* plaintiff does not allege anywhere in his complaint that the 24 John Does, or Ayman Alouri, knew or ever met with the FBI. (With the exception of a conclusory allegation that "upon information and belief" one or more of the John Does were federal agents themselves.) In *Brever,* all of the defendants knew each other, worked together, and attended two critical staff meetings. Additionally, remarks were made that could directly support an inference of an agreement. *Brever,* 40 F.3d at 1123, 1124 (statements that whistleblowers will be "dealt with severely and completely" and subsequently, "That's what you get for making waves.") Importantly, the pattern of harassment itself was not the only allegation in the complaint that supported the element of agreement: there were two meetings at which it was made clear that management did not want employees to cooperate with an ongoing investigation

and would "deal with" those who did cooperate. These sentiments were expressed by, or made in the presence of, the very persons who allegedly undertook the harassing conduct. The comments made and the relatedness of the alleged conspirators, coupled with the timing and nature of the harassment, were certainly sufficient to create an inference that there was a "meeting of the minds" among the conspirators in *Brever.* Here, however, plaintiff is attempting to create an inference of an agreement based only on the alleged pattern of intimidation by persons he cannot show even knew one another. That was not the case in *Brever.*

Importantly, this case is before this Court not only on motions to dismiss, but also on alternative motions for summary judgment. Thus, it is not enough for plaintiff to come forward with allegations that would merely survive a motion to dismiss. In opposing a properly supported motion for summary judgment, plaintiff cannot rest upon mere allegations, but must set forth specific, admissible facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Even if plaintiff could survive a motion to dismiss for failing to allege a conspiracy sufficiently, he cannot survive defendants' motions for summary judgment. In response to defendants' motions, plaintiff does not come forward with any evidence that would support a "meeting of the minds", a critical element to the establishment of a conspiracy.[8] He submits affidavits from Kathy and from Mr. Ruddy, confirming their observations with respect to the behavior of the John Does and the Alouris. However there is still no indication of who these men are and any connection they may have to agents Monroe and Bransford or to the Federal government generally. Indeed, even if plaintiff could show that the John Does were somehow tied to the federal government, which he has not, that would,

---

8. Plaintiff has not argued that particular, additional discovery would provide evidence of an agreement. In any event, plaintiff has not

made enough of a showing of the existence of a conspiracy to warrant further discovery.

at the most, tie them to the United States, which is no longer a party to this action.

■■■ Plaintiff also submits the result of a lie detector test, which at the most confirms the alleged observations but does not support an inference of an agreement involving the named defendants and which, in any event, is not admissible evidence. Finally, plaintiff offers affidavits of individuals, whom he would presumably call as experts, who would testify that the alleged pattern of harassment would be indicative of witness tampering in their experience. These witnesses, however, have nothing to offer regarding the named individuals or any information about whether there was an agreement to intimidate plaintiff as alleged *in this case*. One affidavit, by Gene Wheaton, who represents that he is very familiar with the psychological operations and techniques of the intelligence community, states that "[t]his case appears to be the misuse of surveillance techniques to scare and intimidate the witness or to destroy his credibility." Affidavit of Gene Wheaton, Plaintiff's Exhibit 5, attached to Plaintiff's Opposition to Federal Defendants' Motions. In his Affidavit, Mr. Wheaton states as follows:

> Mr. Clarke [plaintiff's counsel] has asked me to render an opinion on the following question: Was one of the purposes of the actions described in the Amended Complaint to intimidate Mr. Knowlton to try to prevent him from testifying freely, fully, and truthfully? In my opinion, provided the events reported in the Amended Complaint are accurately portrayed, my answer is yes.

Wheaton Aff. ¶ 10. The second affidavit offered by the plaintiff is by Ted L. Gunderson, who proffers that if called to testify, he would state that the falsifications of plaintiff's statements in the FBI report and the failure of the FBI to call plaintiff

to testify until two years after the incident are inexcusable failures and establish "possible purposeful falsification", "negligence", "incompetence", "and/or a deliberate attempt to obstruct justice." Gunderson Affidavit, Plaintiff's Exhibit 6, ¶ 4(1),(2). According to his affidavit, Mr. Gunderson would also testify that the technique described by plaintiff, of which he is personally knowledgeable, is used to intimidate witnesses from testifying. Gunderson Aff. ¶ 4(4). Neither proffered expert has any information tying any of the defendants to each other or any agreement to deprive plaintiff of his civil rights. Even if expert testimony were deemed appropriate in this case, the proffered opinions do not contribute to a finding that any of defendants before this Court were party to any conspiracy.[9]

Plaintiff offered nothing additional at oral argument. The Court asked plaintiff's counsel, "Do you have any evidence of any agreement by these parties?" Tr. at 31. Counsel responded that "we have shown an agreement by the sequence—number one, most particularly, most primarily, the sequence of events." Tr. at 31. Counsel also referred to the evidence discussed above: two witnesses' affidavits; results of a polygraph; psychiatric report; "expert" reports. Tr. at 31–34. Again, for reasons already discussed, this evidence is not sufficient to raise an inference of an agreement.

It is very telling to note, moreover, that in response to the Federal defendants' motion for summary judgment, plaintiff submitted 118 exhibits, *approximately III of which relate to the overall investigation of the death of Vincent Foster* and which are submitted for the purpose of establishing the alleged greater conspiracy to obstruct that investigation. Similarly, of the forty-

---

9. Plaintiff also offers the report of a psychiatrist who examined plaintiff to determine "his credibility with regard to his reports" of harassment, and who concluded, among other things, that there was "no indication of a paranoid process or of any other pathological process that would tend to undermine Mr. Knowlton's credibility in this instance." Letter of Dr. Thomas C. Goldman, Plaintiff's Exhibit 7. This submission, too, does not provide a basis from which to infer an agreement among the alleged conspirators.

five page memorandum plaintiff submits in opposition to the government's motion for summary judgment, at least forty pages deal with the alleged conspiracy to obstruct justice into the investigation. None of this evidence—even if accurate—supports the allegations against Agent Monroe, Agent Bransford, or Ayman Alouri. Even if plaintiff could prove the existence of a conspiracy to impede the Foster investigation, plaintiff cannot rely on that conspiracy alone to pursue § 1985(2) charges against the defendants now before the Court. Indeed, even if plaintiff could prove that Agents Monroe and Bransford were involved in some greater conspiracy to obstruct justice into the investigation of Mr. Foster's death, he would still have to prove the allegations of the alleged § 1985(2) conspiracy that is before this Court, the conspiracy to intimidate plaintiff's grand jury testimony by the alleged pattern of harassment. A comparison to *Brever*, which plaintiff calls a "very similar" case, *see* Plaintiff's Opposition to Fed. Defendant's Motion to Dismiss, at 1–2, is instructive—it clearly would not have been sufficient in that case for the plaintiffs to provide the Court with a deluge of evidence to support allegations of wrongdoing at the plutonium plant. Even if the conspiracy against the plaintiffs in *Brever* ultimately was tied to the fact that there was wrongdoing at the plant which defendants wanted to and agreed to cover up, the evidence of such wrongdoing itself would not have been sufficient. Plaintiffs in *Brever*, and plaintiff here, must come forward with evidence that is sufficient to support an inference that the persons before the Court came to an agreement to commit a violation of § 1985(2). Plaintiff has not done so.

Plaintiff's submissions also cause the Court to pause for another reason. The reports of two Independent Counsel, Robert B. Fiske and Kenneth W. Starr, officially concluded that Mr. Foster's death was a suicide and that the overwhelming weight of the evidence supports this conclusion. *See* Ayman Alouri's Memorandum in Support of Motion (attaching as an exhibit the conclusion of the report of Independent Counsel Fiske); Report on the Death of Vincent W. Foster, Jr. (Independent Counsel Kenneth W. Starr), attached to Federal Defendants' Response to Motion for Leave to File, at 111 ("The available evidence points clearly to suicide as the manner of death.") and at 114 ("In sum, based on all of the available evidence, which is considerable, the OIC agrees with the conclusion reached by every official entity that has examine the issue: Mr. Foster committed suicide by gunshot in Fort Marcy Park on July 20, 1993."). Plaintiff insists that he does not seek the forum of this Court in which to air his belief that the investigation into the death of Vincent Foster was significantly impeded or to challenge the official conclusions of suicide. Plaintiff concedes, in fact, that if that is what he sought to do, he would lack standing. *See* Tr. at 12–13. (The Court: "If [plaintiff] was not asserting any injury to himself, I take it he wouldn't have standing to make the other argument [regarding an ongoing overall FBI conspiracy]; is that right?" Plaintiff's counsel responded, "That's correct, Your Honor, if he did not have a valid section 1985 claim, then he would not have any cause of action to go forward, except with the possible exception of intentional infliction of emotional distress.") Plaintiff's assertions regarding what he seeks to prove by this lawsuit, however, are belied by his submissions to this Court. The great bulk of the arguments and exhibits presented to the Court by the plaintiff have nothing to do with the immediate issue before the Court, except to the extent that plaintiff alleges that the narrower conspiracy was undertaken in furtherance of the greater conspiracy.

As the Court has already discussed, however, *even if* plaintiff could sufficiently establish by his voluminous filings the existence of a conspiracy to obstruct justice into the investigation of the death of Mr. Foster, he cannot rely solely on the exis-

tence of that conspiracy to establish the § 1985(2) violation before this Court. Plaintiff, if his papers are scrutinized carefully, seeks to do just that. As discussed above, with respect to the only named parties plaintiff has brought before this Court—Agents Monroe and Bransford, and Mr. Alouri—plaintiff has not sufficiently alleged any connection, by inference or otherwise, to any conspiracy.

### D. Plaintiff's Motion for Leave to File Revised Second Amended Complaint

Subsequent to the briefing on the motions for summary judgment, and after oral argument, plaintiff filed a **Motion for Leave to File Revised Second Amended Complaint.** By his motion, plaintiff seeks to accomplish essentially three things: First, plaintiff confirms that he has not exhausted his administrative remedy under the FTCA and therefore no longer names the United States as a defendant. Second, plaintiff seeks to allege additional facts with respect to defendant Ayman Alouri. Specifically, plaintiff would allege that the white Honda driven by Alouri on October 27, 1995, bore the Virginia license plate numbered N.Y. 7534. The amended complaint would also note that defendant Alouri had removed this plate, affixed it to a different car, and then reported it lost in August of 1996. Finally, plaintiff seeks to add the following six defendants: Robert Edwards, identified as a United States Park Police Sergeant; James C. Beyer, identified as Deputy Chief Medical Examiner, Northern Virginia District; John Doe Pathologist, who allegedly assisted in the autopsy of Mr. Foster; Robert Bryant, a former Special Agent–in–Charge of the FBI's Washington Metropolitan Field Office; Scott Jeffrey Bickett; and John Doe FBI Laboratory Technician. Defendants oppose the motions.

Plaintiff's motion will be denied. Plaintiff has already conceded that the United States cannot at this time be a proper party to this litigation. Thus, and because the Court has determined to grant defendants' motions for summary judgment, it is unnecessary for plaintiff to amend his complaint at this stage of the litigation to drop the United States as a defendant.

Plaintiff's effort to allege additional facts regarding Ayman Alouri is similarly futile. To the extent plaintiff has evidence to support his case, he could simply have submitted it in opposition to the dispositive motions. In any event, the newly alleged facts do not overcome the fatal deficiency in plaintiff's case: the new allegations do not establish any basis for a reasonable inference that Mr. Alouri knew or conspired with any other defendants.

Finally, plaintiff seeks to add a number of defendants. With one exception, these defendants are alleged to have participated in the overall conspiracy to obstruct justice into the investigation of Mr. Foster's death, and thereby to be liable for the "subsidiary" § 1985(2) conspiracy against plaintiff. Robert Edwards is identified as a retired United States Park Police sergeant, and is alleged to have "tamper[ed] with the crime scene" by manipulating Mr. Foster's body. He also is alleged to have "absconded" with photographs taken at the scene by another officer prior to his arrival. *See* Proposed Revised Second Amended Complaint ¶¶ 32–41. James C. Beyer, identified as a Deputy Chief Medical Examiner, and John Doe Pathologist, who assisted Beyer in the performance of the autopsy of Mr. Foster, are alleged to have undertaken a large part of the autopsy out of police presence, in violation of regulations, in part to further the overall conspiracy by concealing certain evidence inherent in the wounds suffered by Mr. Foster. *Id.* ¶¶ 42–46. Beyer is alleged to have committed a number of other specific acts in furtherance of the conspiracy to conceal the circumstances surrounding Mr. Foster's death. *Id.* ¶¶ 48–54.

Robert Bryant, identified as the Deputy Director of the FBI, is alleged to have made untrue remarks regarding the cause of Mr. Foster's death with the intent to

further the "cover-up" of the circumstances of the death. *Id.* ¶¶ 55–57. John Doe FBI lab technician(s) are alleged to have failed to report the gun shot residue evidence accurately with the intent to conceal the feasibility of the gun shot wound being self-inflicted. ¶¶ 78–100.

Plaintiff does not allege any "agreement" or "meeting of the minds" between these defendants and any other coconspirators, other than in completely conclusory fashion. There is no indication of how, or when, or with whom, for example, the Virginia medical examiner agreed to participate in an overall cover-up. Similarly, there is no such allegations or evidence with respect to the other newly-named defendants. More importantly, as discussed previously, because plaintiff has failed to establish an agreement to interfere with his grand jury testimony, the evidence regarding the greater conspiracy is inconsequential.

 The one exception to these proposed defendants is Scott Bickett, who is alleged to have taken actions directed toward plaintiff in furtherance of the conspiracy to interfere with his testimony. Plaintiff alleges that the night before his second interview with Agent Monroe, he was tailgated by Bickett, and that after an altercation over a parking space, Bickett was seen vandalizing his car, causing severe damage. *Id.* ¶¶ 66–69. Plaintiff further "reasonably believes and therefore avers that Bickett is employment [sic] by the Department of Defense with a Sensitive Compartmented Information security clearance, and that Bickett was briefed at FBI headquarters and has served at the direction of FBI personnel." *Id.* ¶ 70. Plaintiff alleges that Bickett undertook his acts of vandalism at the direction of the FBI, for the purpose of causing plaintiff to be in a "deteriorated emotional state" during his second interview with Agent Mornoe. *Id.* ¶ 70. Plaintiff fails, again, to connect Mr. Bickett with any other alleged conspirator, except to "aver" upon "reasonable belief" that Mr. Bickett works for the Department of Defense. Even if each detail of plaintiff's interaction with Mr. Bickett is accurate, it does not establish that the incident was connected in any way to the alleged conspiracy. Plaintiff has offered no evidence that Mr. Bickett knows any other alleged conspirator, met with any other conspirator, or otherwise has any connection whatsoever to the investigation of Foster's death or those involved in covering it up.

For the foregoing reasons, the Court determines that permitting plaintiff to amend his complaint would be futile, because it would not change the Court's determination that the defendants' motions for summary should be granted. Therefore, plaintiff's motion to file a revised second amended complaint will be denied. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) *Gaubert v. Federal Home Loan Bank Bd.*, 863 F.2d 59, 69, 274 U.S.App. D.C. 153, 163 (D.C.Cir.1988) (upholding district court's denial of a motion to amend where district court had determined that the amended complaint failed to develop conclusory allegations of the first complaints); *Armstrong v. United States Bureau of Prisons*, 976 F.Supp. 17, 21 (D.D.C.1997) (denying motion to amend complaint as futile where the plaintiff could not meet burden of showing that there were genuine issues for trial).

### III. Conclusion

For the reasons set forth in this memorandum, defendants' motions for summary judgment will be granted. Plaintiff has failed to offer sufficient evidence from which a reasonable fact finder could determine that there existed a meeting of the minds between any of the alleged conspirators. Therefore, his claim pursuant to § 1985(2) must be dismissed. Plaintiff's only federal claim having been dismissed, there is no basis for jurisdiction over his remaining state law claims, and those will therefore be dismissed as well. Finally, plaintiff's motion for leave to file a revised

second amended complaint will also be dismissed. An appropriate order accompanies this memorandum.